UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                Case No. 11-CR-241

JOHN J. KELLOGG et. al,

    Defendants.
_____

## GOVERNMENT'S TRIAL BRIEF
_____

**I. INTRODUCTION**

  John Kellogg, Christopher Halfmann, Mark Barlament, and Mike Renken are charged with Lacey Act violations contrary to 16 U.S.C. §§ 3372 and 3373 and false statement charges pursuant to 18 U.S.C. § 1001. As will be more fully set forth below, law enforcement believes that Kellogg and some of the other defendants are responsible for illegally killing at least eleven black bears in connection with Kellogg's operation of Kellogg's Guide Service. Two of those illegal bear kills, occurring in 2009 and 2011, are reflected in the charges set forth in Count One and Two.

  More specifically, the government alleges that Kellogg and Halfmann were acting as bear hunting guides for a party of hunters that included two undercover state game wardens from Kentucky. Barlament accompanied Kellogg, Halfmann, and the two wardens on the 2009 bear hunt and was a critical component of that hunt as he was the only person in the party to possess a license to kill a bear. Prior to the hunt, Barlament and Kellogg arranged to transfer this license to one of the undercover wardens. Unlike regulations concerning deer hunting, state law prohibits a licensee (Barlament) from transferring his bear license tag to another. At Kellogg's direction, an undercover warden shot a bear and Barlament's license was used to tag the bear. The undercover warden paid Kellogg $1,000 for the bear license and an additional $400 for Kellogg's guide service. The bear hide and meat were later transported in interstate commerce to (or by) the wardens from Wisconsin to Kentucky thereby satisfying the Lacy Act elements.

Kellogg and Halfmann guided the two undercover wardens and others on a second bear hunt in 2011. For this hunt, Renken possessed a valid license to kill a bear. Kellogg arranged for Renken to transfer this bear tag to one of the undercover wardens. Prior to the bear being shot it mauled Halfmann necessitating his transfer to the hospital. Kellogg then illegally killed the bear in violation of at least two state laws, namely transferring a bear tag to another and hunting without a license (Kellogg's hunting privileges were revoked in February 2011 stemming from a state court hunting conviction). Halfmann's mauling resulted in U.S. Fish and Wildlife agents advising local law enforcement of this undercover investigation which resulted in the investigation terminating early. Consequently, the bear meat and hide were not shipped out of state and this second hunt was indicted as an attempt as authorized under the Lacey Act.

This trial brief will outline the Lacey Act law, its relationship with State law, provide an overview of the anticipated testimony at trial, and identify possible legal issues.

## II. LEGAL FRAMEWORK.

A. The Lacey Act.

The Lacey Act prohibits the sale and transportation of wildlife in interstate commerce when it is taken or possessed in violation of state law. 16 U.S.C. § 3372(a)(2). The statute also prohibits the attempt to commit such an offense which is pertinent to the 2011 hunt. A violation of the Lacey Act is a misdemeanor unless the offense is committed by one who (1) knowingly engages in "conduct involving the sale or purchase (or offer of sale or purchase) of wildlife";[1] (2) having a market value in excess of $350; and while (3) knowing that the wildlife was taken or possessed in violation of any law. 16 U.S.C. § 3373(d).

The Ninth Circuit has the following pattern jury instruction for felony Lacey Act cases:

---

[1] Conduct involving the sale of wildlife is defined as for money or other consideration offering or providing guide or outfitting service for the illegal taking or possessing of wildlife. 16 U.S.C. § 3372(c).

<u>First</u>, the defendant sold or transported wildlife in interstate commerce or attempted so;[2]

<u>Second</u>, the defendant did so by knowingly engaging in conduct involving their sale;

<u>Third</u>, the defendant knew the wildlife was taken, transported or possessed in violation of the law; and

<u>Fourth</u>, the wildlife had a market value in excess of $350.[3]

The case of *United States v. Fejes*, 232 F.3d 696 (9th Cir. 2000) is factually similar to the instant case and supports the validity of the above jury instruction. Fejes was a licensed hunting guide who agreed to take two out-of-state hunters on a guided caribou hunt in Alaska. Prior to the hunt, he accepted a guide fee of $3,500 from one hunter and compensation in the form of an advertising spot valued at $2,750 from the other. Fejes then accompanied the two hunters on an airplane ride for purposes of better identifying the location of the caribou. The group landed in an area near caribou and – in violation of state law prohibiting hunting from the air– killed a caribou. The caribou meat was later transported to the out-of-state hunter's residence.

For his role in guiding an illegal hunt, Fejes was charged with conspiracy and two Lacey Act violations. Fejes appealed the district court's jury instruction that mirrors the above-stated instruction. Specifically, he argued that the illegal taking of wildlife must precede the sale of guide services to satisfy the Lacey Act.

The Ninth Circuit rejected this interpretation and held that both legislative history and common sense supported the district court ruling. The Lacey Act legislative history supported the proposition that "the providing of guiding, outfitting, and transportation services...used in the illegal

---

[2] Interstate commerce is satisfied by conduct establishing the defendant knew that wildlife would be transported in interstate commerce and took the steps that began their travel in interstate commerce. *United States. v. Gay-Lord*, 799 F.2d 124, (4th Cir. 1986). In a guided hunt case factually similar to the instant case, the defendant arranged to ship wildlife out of state to several hunter or "assisted the hunters in these shipments." This was found to satisfy the interstate commerce element. *United States v. Atkinson*, (unpublished 9th cir. Case, 1992).

[3] Market value of wildlife includes the price paid for a guided hunt, as well as the cost for processing of the wildlife. *United States v. Todd*, 735 F.2d 146, (5th Cir. 1984).

- 3 -

taking, acquiring, receiving, transporting, or possessing of fish or wildlife" subjects a violator to felony Lacey Act provisions. And the district court decision simply made good sense as it would be absurd to absolve guides of criminal activity when they learn "before a hunt but after financial arrangements were made that their customers intended to take game illegally. *Id*. at 701.

B. Wisconsin bear hunting laws.

As noted above, The Lacey Act makes unlawful the transportation or sale in interstate commerce of wildlife taken in violation of State law. The instant case involves Kellogg and others illegally hunting bear. Bear hunting in Wisconsin is regulated by both Wisconsin Statute and rules established by the Wisconsin Department of Natural Resources (DNR) listed in the Administrative Code. The DNR provides pamphlets, a website, and other notice to bear hunters of applicable statute and code provisions. Wisconsin Statute provisions make clear that no person may hunt bear, assist another in hunting bear, bait bear, or train a dog to track bear without a Class A or Class B bear license. *See*. Wis. Stats. § 29.184(3)(a). State law requires a Class A bear license in order to shoot and tag a bear.[4] *See*. Wis. Stats.§ 29.184(3)(bg). State law also provides for the issuance of a Class B bear license to assist a Class license holder and track bear. *See*. Wis. Stats. § 29.184(3)(br). Wisconsin case law supports the criminal prosecution of license violations. *See State v. Johnson*, 276 Wis. 2d 572 (Ct. App. 2004) (defendant who held a Class B bear license but shot bear and used wife's Class A bear license tag was found in violation of the statute).

In July 2011, a new law went into effect allowing a Class B bear license holder to perform a "backup shooter" function. *See*. Wis. Stats. § 29.184(3)(br)(4). A Class B license holder may now shoot a bear provided that it was previously lawfully shot, but not killed by a Class A bear license holder. However, this may only occur if killing the bear is necessary to protect human safety and the "backup shooter" is in the same hunting party and at the point of kill with the Class A bear licensee who first shot the bear.

---

[4] Law enforcement report that a Resident Class A bear license only costs $50 but usually takes between seven and ten years to obtain as it is awarded based on a point system.

- 4 -

Irrespective of whether the bear is shot by the Class A licensee or the Class B licensee, the Class A license holder must validate the carcass tag and attach it to the bear immediately upon killing and before moving the bear. *See*. Wis. Stats. § 29.184(8).

Two other state laws of significance in the instant case are Wis. Stats. § 29.024(2) and Administrative Code provision NR 10.07(2m). Section 29.024(2) prohibits the transfer or use of his or her approval (meaning license or tag) by any other person. Admin. Code NR 10.07(2m) prohibits any person from beginning a hunt over bait that contains any animal part or animal byproduct.[5]

### III. STATEMENT OF CASE

In a very general sense, the case involves Kellogg and Halfmann guiding others on two bear hunts (occurring over several days in 2009 and 2011) in violation of state law. Both hunts included undercover game wardens posing as hunters who later paid Kellogg for his guide services.

A. Bear Conservation and Regulation of Bear Hunting.

In Wisconsin, bear management follows concepts of the North American Model of Wildlife Conservation. The guiding principles of this model include: (1) wildlife is a resource entrusted to the general public; (2) markets for game must be eliminated; (3) wildlife must be allocated pursuant to law; (4) wildlife should only be killed for a legitimate purpose; (5) wildlife is considered an international resource; (6) science is the proper tool for determining wildlife policy; and (7) hunting should be administered on a democratic basis.

Wisconsin's bear hunting population is managed primarily through hunting based on a strict quota/permit issuance system designed to ensure the long-term future of the population. More than 104,000 hunters applied for 9,015 permits in 2012, making the wait to receive a harvest permit approximately 5 to 9 years, depending on the bear management zone. The permit system was

---

[5] This provision is significant because the government will prove that the 2011 hunt began with Kellogg, Halfmann, and Renken beginning the hunt and releasing dogs from a calf carcass that was partially eaten by a bear. The dogs quickly picked up on the scent of a bear that had been at the carcass. This bear was later killed by Kellogg after it had injured Halfmann.

- 5 -

Case 1:11-cr-00241-WCG    Filed 06/28/12    Page 5 of 17    Document 52

developed following extensive public hearings and debate. Fundamental to the allocation of permits is that it be conducted in an equitable fashion.

Successful wildlife management has ensured that black bears are currently prevalent in Wisconsin in comparison to previous years. At least one study has determined that in 37 of 39 North American bear populations, human-induced mortality was the major cause of death among adult bears.[6] When enough black bears are killed illegally, the logical choice for wildlife management is to either close or drastically reduce the bear hunting population since black bears are a very slow reproducing species, with females producing at intervals of five years or more between pregnancies.[7] If the bear population is disrupted enough by over-hunting, it will take many years for the bear population to replace themselves thereby punishing the law abiding citizen.

In the Government's view, the defendant's illegal killing of black bear undermined the basic premises of bear management and conservation practice sanctioned by the citizens of Wisconsin. By brokering the illegal transfer of the kill permit, the defendants took the hunting opportunity and allocated it on the basis of wealth.[8] This results in a minority which has special access to the supposedly public resource– those wealthy enough to afford to buy the kill permit. And placing an economic incentive on the harvest often encourages violations of the law. The investigation has documented that, for a variety of reasons, some hunters will illegally track and shoot multiple bears in pursuit of that "trophy bear" or shoot multiple bears for the sole purpose of training hound dogs. This serves to weaken the predictability of the amount of bears killed and the allocation of the correct number of permits to manage the bear population.

---

[6] Bunnell, F. L. and D. E. N. Tait. 1985. Mortality Rates of North American Bears. Arctic 38:316-323.

[7] http://www.aquaticcommunity.com/bears/black/

[8] Should he have a sufficient amount of "preference points" and be a drawing winner, a hunter is assessed a mere $50 fee in order to obtain a Class A license. As stated previously, this can take many years to obtain.

B. Background on Kellogg, Halfmann and others.

US Fish and Wildlife Special Agent Steve Stoinski started this investigation after being contacted by Wisconsin Department of Natural Resources (DNR) and other conservation wardens concerning the persistent hunting law violations of various houndsmen including Kellogg. The DNR identified Kellogg as a habitual wildlife violator with a past history of crimes and infractions resulting in the loss of his hunting privileges. Various informants and state wardens advised that Kellogg and other houndsmen were illegally killing wildlife in order to better train their hunting dogs.[9] Accordingly, a joint covert investigation was coordinated between the DNR and the USFWS.

SA Stoinski observed that in October 2006, Kellogg had placed an advertisement in the Wisconsin Outdoor news offering his bear and bobcat guide service doing business as Kellogg's Guide Service. Acting as a potential client, SA Stoinski called Kellogg and engaged him in conversation about his business. Kellogg advised that he charged a $750 fee and a $250 deposit for a guided bobcat hunt. The fee included use of his Plotts hound dogs. Kellogg bragged that he has "killed more (bob)cats than anyone else in the state."

In July 2009, SA Stoinski used Kentucky Department of Fish and Wildlife Resource Investigators James Bingham and Charles Wilson (hereinafter Bingham and Wilson) to pose as out of state hunters looking to buy trained hunting dogs from Kellogg. Bingham and Wilson met with Kellogg who initially asked them if they were undercover wardens. Kellogg said he was going to check the registration of their vehicle to see if they were associated with law enforcement. Satisfied that Bingham and Wilson were not undercover game wardens, Kellogg sold a hunting hound to Bingham. Kellogg also offered to guide Bingham and Wilson on a bear hunt using his hound dogs and later did so on July 31, 2009 and August 1, 2009. During one of the hunts, Kellogg admitted

---

[9] Houndsmen can generate a significant income by providing guided hunts using their dogs to pursue bear, bobcat, and coyotes. Some will break state and federal wildlife laws in order to better train their hounds that can be sold for thousands of dollars.

that he had previously lost his hunting privileges for illegally killing a bear resulting in him paying a $5,000 fine.[10]

C. 2009 Hunt **(Count One)**.

On August 1, 2009, Kellogg asked Bingham if he and Wilson were interested in hiring him to guide a bear hunt. After Bingham said he did not have a bear tag, Kellogg said he could get a tag for Bingham, but it would be costly. Kellogg said that $1,000 was the price of the bear tag and that Bingham would have to pay for the tag prior to starting the hunt. Kellogg also said if he, Bingham, and Wilson killed a bear using someone else's tag they would have to make sure they didn't get caught by the wardens.

Bingham and Wilson agreed to hunt bears with Kellogg in September 2009. Kellogg told Bingham and Wilson he would arrange for his friend from North Carolina to sell his bear tag to Bingham and Wilson for $1,000 so Bingham and Wilson could kill a bear in Wisconsin. Bingham and Wilson had multiple recorded conversations with Kellogg during which Kellogg confirmed the price for the bear tag would be $1,000.

On September 8, 2009, Bingham and Wilson arrived in Gillett, Eastern District of Wisconsin, for their scheduled bear hunt with Kellogg. Kellogg introduced Bingham and Wilson to Halfmann. Halfmann asked whether it would be Bingham or Wilson who was going to shoot the bear. After Bingham identified himself as the shooter, Halfmann then instructed Bingham on where to shoot the bear. Kellogg said if they treed a little bear Bingham could shoot the bear if he wanted. Halfmann, agreed stating, "You aint got to tag it. You don't have to tag (shoot) the first one you see. Long as it isn't a sow." Kellogg told Bingham if he shot a little bear, "We can just leave it, especially if no one's around or we ain't close to the road. If you've got a problem with that say so now." Bingham said he came to shoot something and Halfmann said, "That's good!"

---

[10] On January 23, 1998, Kellogg was convicted for illegally possessing an untagged bear resulting in a $5,000 fine and 3 year revocation of his hunting privileges.

On September 9, 2009 and September 10, 2009, Bingham and Wilson participated in a guided black bear hunt with Kellogg, Halfmann, and others. Kellogg introduced Barlament to Bingham and Wilson as the person providing his bear tag to Bingham. Kellogg provided guide services and obtained assistance on the illegal bear hunt from Halfmann. At one point, Halfmann instructed Bingham how to erase the track on the GPS so that a warden could not tell where they had hunted. Halfmann also provided Bingham with code words they used on the CB radio when referring to a warden as well as a small caliber and large caliber rifle.

On September 11, 2009, Kellogg and Halfmann guided Bingham, Wilson, and others on a bear hunt resulting in Kellogg's dogs chasing a large, black bear up a tree. Halfmann told Bingham to move in close to the tree in the event the bear needed to be shot twice. Video and audio of the shooting clearly shows Bingham shooting the bear at Kellogg's direction. After the bear was dead, Kellogg saw Wilson filming the hunt and said "I hope you didn't film him shooting!" Kellogg then directed Barlament to shoot in the direction of the bear while the video was running. The video captures Kellogg, Halfmann and others in the group cheering for Barlament as he fired a rifle shot into the air. Barlament then yelled "I got him! I got him with an 870!" Kellogg, Halfmann, and the others then congratulated Barlament.

Barlament gave his bear tag to Bingham to place on the illegally killed bear who in turn provided it to Kellogg. A photograph depicts Kellogg possessing Barlament's tag and then affixing it to the bear. Kellogg and Barlament took the bear to a WDNR registration station and Barlament made a false record claiming he killed the bear. The bear was then taken for processing of the meat and bear hide. At both locations, Barlament falsely proclaimed to be the hunter who killed the bear.

Later that day, Kellogg met with Bingham to obtain his guide fee. Per their agreement, Bingham paid Kellogg $1,000 for use of the bear tag. Bingham also provided Kellogg with $400 for his guide services. Kellogg told Bingham not to tell anyone else about the guide service

payment. Barlament later advised law enforcement that Kellogg provided him with $200 to help cover his travel expenses from North Carolina.

On September 28, 2009, Kellogg contacted Bingham by telephone and told him his bear meat had been processed. On October 4, 2009, Bingham and Wilson traveled to Wisconsin and obtained the bear meat. Wilson paid the remaining balance of $311 for the meat processing.

On March 13, 2010, Bingham received a voice message from Barlament advising that bear rug had been completed. Barlament told the taxidermist that the bear belonged to him but that Kellogg would pay for the bear skin rug. Barlament told Bingham to call Kellogg to arrange for payment and pick up of the bear rug. Bingham then spoke telephonically with Kellogg who advised Bingham he owed the taxidermist $846 for the bear rug. Kellogg later shipped the bear rug to Bingham in Kentucky.

D. September 2011 bear hunt (**Count 2**).

Bingham and Wilson maintained contact with Kellogg in 2010 and into 2011. In 2010, Kellogg guided Bingham and Wilson on a mountain lion hunt in Wyoming and in February 2011, he guided them on a bobcat hunt. Kellogg said that he killed between 15 and 20 bobcats during the 2010-2011 hunting season.[11] He also told them that he was likely to lose his hunting privileges because of a pending state hunting charge. Kellogg stated "I'm not gonna quit hunting"and that Halfmann would drive him around to hunt. Kellogg indicated that he "couldn't get caught fucking around with the dogs. I've done that before. I just got to be careful."

Bingham and Wilson were with Kellogg on February 22, 2011 when Kellogg returned from his state court appearance on his wildlife case.[12] Kellogg said that despite the three-year

---

[11] Wisconsin bobcat hunters are only authorised to kill one bobcat per year, if they draw a bobcat permit. Registration records show that Kellogg did not receive a bobcat permit that season.

[12] Kellogg was convicted on February 22, 2011 in Oconto County case number 2010CM248 of failure to tag a deer carcass. He received a $2,125 fine and a 3 year revocation of hunting privileges.

- 10 -

hunting ban that was ordered, he would continue to hunt by having someone drive him around and handle his dogs. Kellogg hunted bobcats with Bingham and Wilson on February 23rd and February 24th despite his hunting revocation and the bobcat hunting season being closed at that time.

In July 2011, Bingham spoke telephonically with Kellogg. Kellogg said he could obtain another individual's bear tag for Wilson to use to shoot a bear. Kellogg said his guide service costs would be the same as last time. In September 2011, Bingham again spoke with Kellogg who said he just finished putting out bear bait. Kellogg said he obtained a bear tag from an individual in the Merrill, Wisconsin area.

On September 7, 2011, Bingham and Wilson met with Kellogg, Halfmann, and Mike Renken in Merrill, Wisconsin to hunt bear.[13] Renken possessed the Class A bear license intended for Wilson to use. After he was introduced to Wilson, Renken said "so long as you don't talk and I don't talk, its all good." Renken also told Bingham and Wilson to refer to Kellogg as "Bill" since Kellogg's hunting privileges were revoked. That day, Kellogg used his hounds with Halfmann's assistance to track several bears. Kellogg also used a Garmin Astro 220 to track the hounds progress and locations and a two-way radio to give directions to the hunting party. To protect Kellogg, Halfmann told the hunting party that if anyone asked about the dogs they should falsely claim the dogs belonged to Halfmann. Kellogg used Halfmann's name on dog collars he purchased and affixed to the hound dogs. At another point of the hunt, Halfmann carried Kellogg's rifle for Kellogg during the hunt.

On September 9, 2011, Kellogg, Halfmann, and Renken again guided Wilson and Bingham on a bear hunt in Merrill. The bear hunt began by taking the dogs to a farm where several dead calf carcass were dumped to allow the dogs to pick up the bear scent. As Kellogg

---

[13] Merrill is in the Western District of Wisconsin. Kellogg chose to hunt further away from his residence due to the WDNR wardens being familiar with him. Notwithstanding the bear hunt occurring out of district, there were sufficient acts for prosecution in the Eastern District of Wisconsin including telephone conversations and payment of guide services.

later acknowledged to Bingham and Wilson, this violates state law as a bear hunt can't begin from an animal part. After Kellogg's hounds picked up the bear scent by the calf carcasses, Renken and Halfmann (and Bingham and Wilson) communicated with Kellogg using two-way radios. Kellogg tracked his dogs using his GPS system as they chased a bear. At one point, Renken shot at the bear but did not kill it. Renken then met with Bingham in his truck and told him he was not going after the bear but that he wanted Wilson to get the bear. Halfmann also told Wilson to pursue the bear. Shortly thereafter, Halfmann shot and wounded the bear after it approached his location. The bear then attacked and mauled Halfmann until the hounds chased it away. Halfmann was able to walk to a nearby road where he met with Renken who then transported him to the hospital.

Bingham and Wilson then saw Kellogg continue to hunt by tracking the bear with his hounds. Shortly thereafter, they heard four gunshots. When he arrived at Kellogg's location, Wilson saw the dead bear and Kellogg admitted he shot it. Upon his return from the hospital, Renken was directed to the bear's location. Using Renken's bear tag, Kellogg notched the bear tag and Renken then affixed it to the bear.[14] The bear was then gutted and skinned and Renken falsely registered the bear at a WDNR registration station. Kellogg directed Bingham and Wilson to transport the bear from Merrill to Kellogg's residence in Gillett, Wisconsin. Kellogg then instructed Bingham and Wilson to take the bear to a local taxidermist to make a bear rug. Kellogg said he would have the bear meat processed and sent to Wilson and Bingham.

Later that day, Bingham and Wilson provided Kellogg with $500 for his guide services during the bear hunt. Kellogg said the lesser guide fee was warranted because Wilson did not shoot the bear. Kellogg suggested they pay Renken only $50 for use of his license. Bingham also provided Kellogg with $100 deposit to have the bear meat processed. Kellogg said that he

---

[14] Even though he tagged the bear, Renken has still violated Wis. Stats. Sections 29.184 (because he did not shoot the bear) and 29.024 (because he transferred his tag to Kellogg who had killed the bear).

- 12 -

Case 1:11-cr-00241-WCG   Filed 06/28/12   Page 12 of 17   Document 52

spoke with Halfmann at the hospital and told him to not say anything about the bear hunt. Kellogg indicated that he hoped they had a "good time" and he would work on obtaining a "tag" for next year.

Later that day, Bingham and Wilson met with Renken and asked him how much money he wanted for use of his license. Renken responded "Whatever you think. It's up to you guys, it's your guy's hunt. Whatever you think is fair." Bingham provided Renken with $350.

E.  Execution of Search Warrants at Kellogg's residence and other locations.

On October 5, 2011, a federal search warrant was executed at Kellogg's residence. Law enforcement seized five of Kellogg's hound dogs used during the 2009 and 2011 bear hunts. They also seized firearms, ammunition, dog hunting items, and frozen wild game.

That same day, a search warrant was executed at Gillett Meats, the business that processed the bear meat from the 2009 hunt, as well as Big Woods Taxidermy. Records were taken from Gillett Meats. The black bear hide from the September 9, 2011 hunt was taken from Big Woods. The owner of Big Woods recalled that two hunters from Kentucky brought the bear to him that day and said the bear belonged to Mike Renken.

F.   False statements of Kellogg, Halfmann, Renken, and Barlament **(Counts 3-6)**.

The above defendants are charged with making false statements to federal agents. More specifically, they are alleged to have made false statements as to who was hunting and who killed the bear during the applicable hunt(s).

SA Stoinski interviewed Kellogg following his arrest on October 5, 2011. Kellogg denied participating in any hunt on September 9, 2011. Kellogg denied shooting a bear that day and claimed that Renken shot the bear. Kellogg said if he had been there Halfmann would not have "gotten his ass chewed up." When pressed further, Kellogg asked for an attorney.

Halfmann was interviewed on several occasions about the 2011 hunt. Initially, he was interviewed by a Wisconsin DNR warden at a hospital in Green Bay following his surgery.

Halfmann would not reveal who he was hunting with other than Renken. Halfmann claimed he did not know if the bear was tagged, registered or who killed it.

Halfmann was interviewed by federal FWS agents on October 5, 2011. In contrast to his earlier statement, Halfmann claimed that Renken shot at and killed the bear. After he tagged the bear, Renken took Halfmann to the hospital. Halfmann said that Kellogg was not guiding the hunt on September 9, 2011 when he was mauled by the bear. Halfmann claimed that Kellogg was logging that day.

Renken was interviewed by FWS agents that same day. Renken said that he was hunting with Halfmann and a group of others including "Bill"– an individual he later learned was Kellogg. Renken said Kellogg was not guiding or hunting with the party. He indicated the dogs used for the hunt belonged to Halfmann. Renken advised that he shot at the bear and missed but that Halfmann hit the bear. The bear then mauled Halfmann requiring Renken to take Halfmann to the hospital. Renken claimed he then returned to the area, tracked the bear, and shot it four times. Renken denied receiving any money from other hunters in the group. He indicated the "guys from Kentucky" offered him money for bait and gas but that he declined.

Barlament was also interviewed by FWS that same day about the September 2009 hunt. Barlament admitted that he possessed a Class A bear license for that hunt. Initially, Barlament said that he killed the black bear during the hunt with an .870 Remington shotgun. When advised that others in the case were cooperating, Barlament changed his story and maintained that he shot at the bear, he participated in the hunt, it was a "party hunt" and that he tagged the bear. Later, he took the meat to be processed, registered the hide to be processed, and then gave the bear away to one of the Kentucky undercover officers. Barlament said he did not receive any money from Kellogg or the Kentucky hunters for use of his kill license.

G. Other hunts.

U.S. Fish and Wildlife agents have documented at least nine additional illegal bear kills by Kellogg and others. The government intends on filing prior to trial an other act evidence

- 14 -

motion seeking admission of evidence concerning two additional illegal bear kills. The first illegal bear kill occurred on September 13, 2009 and included Kellogg, Halfmann, the two undercover wardens and M.M. That day, the hunting party chased a small bear that Kellogg later shot and left in the woods. Kellogg did not have a bear license and the bear was later recovered in the woods by law enforcement. M.M. later admitted that Kellogg shot the bear and they let the bear rot in the woods without placing a tag on it.

The second illegal bear kill occurred on October 10, 2010, and involved Kellogg, Halfman, Renken, Hershfield, and J.B. J.B. had a Class A bear license tag but Kellogg killed the bear and used J.B.'s bear tag. Kellogg arranged for the bear to be made into a bear mount which was later seized from Kellogg's residence along with photographs of Kellogg and J.B. posing with the bear. J.B. later admitted to law enforcement that Kellogg killed the bear. Kellogg also admitted to the undercover wardens that he killed the bear and used J.B.'s bear license.

This law enforcement investigation documented the following seven other illegal bear kills: (1) Dave Renken bear- October 2010, Kellogg, Halfmann, and another were in the party. Kellogg shot bear and used Renken's bear tag; (2) V.R. bear- 2010. Kellogg, C.T., J.B., J.H., and Halfmann participated in the bear hunt. Kellogg killed the bear and used V.R's tag; (3) M.M. bear 2009. M.M. had the Class A license and was guided by Kellogg. With Kellogg's knowledge, M.M. transferred the tag for his daughter to use; (4) J.H. 2010 bear hunt. This hunt included Kellogg, J.H., Halfmann and J.B. Kellogg shot a bear because it allegedly was attacking his hunting dogs. Kellogg did not have a license to kill the bear. Halfmann had a bear tag but did not use it on the bear; (5) Michigan bear hunt 2004 involving J.H., Kellogg, and Halfmann. J.H. had a bear kill tag and killed a bear. A second bear was caught by the dogs and Kellogg instructed J.H. to shoot the bear. J.H. shot the bear and it was left in the woods at Kellogg's instruction. The bear was too small to tag and was killed solely to train Kellogg's dogs; (6) M.M. hunt 2004 in Michigan with Kellogg. M.M. admitted to law enforcement that Kellogg guided him on a bear hunt resulting in M.M. killing a bear without a bear license. M.M.

has a picture of the bear that was killed; (7) J.H. advises he was present when Kellogg and R.T. killed a bear at an unknown time and date. J.H. reported that Kellogg shot the bear and left it in the woods because it was killed during the dog training season and outside the bear hunting time period.

    G.  Possible defenses.

The government is not aware of any viable defense Kellogg may offer. From its perspective, the government case against Kellogg is strong as it includes tape recorded conversations in which he discussed the sale of both Barlament's and Renken's bear license with the undercover wardens. Further, Kellogg is recorded on video and audio tape assisting in guiding the respective hunts– the later one of which was during a time when he was banned from hunting. Finally, the tape recorded conversations with the undercover wardens memorialize Kellogg's acceptance of money for guiding both hunts, and, as to the first hunt, arranging for the interstate transfer of the bear hide and meat.

Similarly, the government views the case against Halfmann as equally strong given the tape recorded conversations between Halfmann and others which makes clear that he knew Barlament and Renken were providing their bear licenses to the undercover wardens. Further, it is proven through the recordings that Halfmann was guiding others on the bear hunt by providing instructions to hunters, checking bear baits, and monitoring the location of the hunting dogs.

Halfmann may claim that he did not receive any compensation for either hunt. As noted above, the Lacey Act statute requires proof of conduct involving the sale of wildlife, meaning for money or other consideration offering or providing guide or outfitting service for the illegal taking or possessing of wildlife. In response, the government will offer proof that Halfmann received some compensation, albeit relatively minor compared to Kellogg. A witness and participant to the 2009 hunt will testify that Kellogg paid Halfmann $100 after he complained to Kellogg that Bingham and Wilson did not pay him anything for Halfmann's help during the hunt. Halfmann had previously indicated to others that he spent a lot of money on gas to get

Bingham's bear. A second witness is expected to testify that Halfmann also complained to him that Bingham and Wilson did not pay him any money for the hunt or even offer to pay for their incidental expenses, such as lunch.

As to the 2011 hunt, the government has no evidence that Halfmann was in any way compensated financially for assisting in the hunt. But that doesn't matter. As to both hunts, Halfmann is charged as a principal pursuant to 18 U.S.C. § 2. Aider and abettor liability attaches when a defendant has "knowledge of the illegal activity that is being aided and abetted, a desire to help the activity succeed, and some act of helping. *United States v. Hunt*, 272 F.3d 488, 493 (7th Cir. 2001). Halfmann need not directly commit all elements of the offense. Moreover, as set forth above, the 2011 hunt is charged as an attempted Lacey Act violation.

Turning to Barlament and Renken, it is equally hard to predict a viable defense. Both Barlament and Renken spoke openly with the undercover wardens concerning their willingness to unlawfully transfer their bear licenses. Renken received money from the wardens for the use of his bear license. Barlament acknowledged during a later interview that he and Kellogg arranged for the bear license to be transferred to one of the undercover wardens.

Respectfully submitted at Green Bay, Wisconsin, this 28th day of June, 2012.

        JAMES L. SANTELLE
        United States Attorney

By:

        S/WILLIAM J. ROACH
        Assistant United States Attorney
        Bar Number: 1018756
        Attorney for Plaintiff
        Office of the United States Attorney
        Eastern District of Wisconsin
        205 Doty Street
        Green Bay, Wisconsin 54301
        Telephone: (920) 884-1067
        Fax: (920) 884-2997
        E-Mail: william.j.roach@usdoj.gov